## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DIANA DUKICH and JOHN DUKICH, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

IKEA US RETAIL LLC and IKEA NORTH AMERICA SERVICES, LLC,

*Defendants*.

CIVIL ACTION NO. _____

**CLASS ACTION COMPLAINT**

**TRIAL BY JURY DEMANDED**

NOW COME Plaintiffs, DIANA DUKICH and JOHN DUKICH, on behalf of themselves and all others similarly situated, and complaining of Defendants IKEA US RETAIL LLC and IKEA NORTH AMERICA SERVICES, LLC (collectively "IKEA" or "Defendants"), allege as follows:

## I.     PRELIMINARY STATEMENT

1.     Plaintiffs Diana Dukich and John Dukich are adult individuals and are citizens and residents of the State of Minnesota.  Plaintiffs are the parents of two young children who purchased MALM dressers from IKEA, a national retailer, in or about 2012.

2.     IKEA manufactured and sold dangerous and defective chests and dressers under the model name MALM and other model names (hereinafter collectively the "chests and dressers," "subject chests and dressers" or "defective chests and dressers") to Plaintiffs and the Class over a period of several years.

3.     The dangerously defective chests and dressers were front-heavy, unstable and due to their poor design, prone to tip over during normal and expected use, resulting in death and injury to many children.

4.     The defective design of the subject chests and dressers was admitted by IKEA when it publicly recognized that its dressers were unsafe, unstable and unfit for use as freestanding furniture in a voluntary recall initiated with the United States Consumer Products Safety Commission ("CPSC") on June 28, 2016, which IKEA "re-announced" on November 21, 2017.

5.     In the recall, IKEA admitted that "[T]he recalled chests and dressers are unstable if they are not properly anchored to the wall, posing a serious tip-over and entrapment hazard that can result in death or injuries to children…Consumers should immediately stop using any recalled chest and dresser that is not properly anchored to the wall and place it into an area that children cannot access." *See* June 28, 2016 Recall Announcement and list of Non-MALM recalled IKEA Chests of Drawers/Dressers attached hereto as Exhibit "A."

6.     IKEA further promised that "[C]onsumers are entitled to a full refund for chests and dressers manufactured between January 2002 and June 2016." *Id.*

7.     Plaintiffs and the Class did not know and could not have known until the 2016-2017 timeframe that their IKEA dressers were dangerous, defective and not safe or suitable for their ordinary use.

8.     Despite knowledge that its chests and dressers were unstable, unsafe and unfit for normal use, IKEA's recall efforts have been woefully inadequate and ineffective in advising consumers of the recall, removing these dangerous products from consumers' homes and reimbursing consumers for the full purchase price of the subject defective and dangerous chests and dressers.

9.     Indeed, available data indicates that IKEA's feeble recall efforts have resulted in the recall of only a paltry number of the defective and dangerous chests and dressers from the homes of American consumers.

2

10.     Although IKEA promised a "full refund" to all owners who requested a refund in connection with the recall, this was a mirage, as will be further discussed below.  Most purchasers of the defective chests and dressers did not receive notice of the recall, as a consequence of IKEA's decision not to contact purchasers directly by mail, email, text or other means. Further, plaintiffs and class members who were aware of the recall received no refund, even though Plaintiffs and many other consumers tried to return the defective and dangerous chests and dressers and sought the full refund promised under the voluntary recall.

11.     Now, Plaintiffs and a Class of purchasers and owners of the defective chests and dressers seek through a class action to compel IKEA to honor the promise it failed to keep because of its anemic voluntary recall.

## II.      JURISDICTION *and* VENUE

12.     This Court has personal jurisdiction over the parties.

13.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to the Class Action Fairness Act and 28 U.S.C. § 1332(d).

14.     Upon information and belief, the number of all proposed plaintiff class members in the aggregate is greater than 100 and the aggregate value of the claims of the individual class members exceeds the sum or value of $5,000,000, exclusive of interest and costs.

15.     Venue is proper in this District because Defendants maintain their United States headquarters in this District.

## III.     PARTIES

16.     Plaintiff DIANA DUKICH is a natural person.

17.     Plaintiff JOHN DUKICH is a natural person.

3

18.     Defendant IKEA US RETAIL LLC ("IKEA Retail") is a Virginia limited liability company with a principal place of business located at 420 Alan Wood Road, Conshohocken, Pennsylvania.  At all times relevant to Plaintiffs' claims, IKEA Retail was and is the business entity responsible for the sale, distribution and returns of the defective chests and dressers. The location of IKEA Retail is the U.S. headquarters for the U.S. retail sales of IKEA furniture.

19.     Defendant IKEA NORTH AMERICA SERVICES, LLC ("IKEA Services") is a Virginia limited liability company with a principal place of business located at 420 Alan Wood Road, Conshohocken, Pennsylvania.  Upon information and belief, IKEA Services is the IKEA business entity responsible for executing the recall of the defective and dangerous chests and dressers, for issuing national communications and representations concerning the same, and for providing information to the CPSC concerning the same.[1]

## IV.     FACTUAL ALLEGATIONS

### IKEA's Defective and Dangerous Chests and Dressers

20.     At all times relevant hereto, IKEA designed, manufactured, tested, distributed and sold furniture throughout the United States, including at IKEA retail stores in Pennsylvania.

21.     IKEA's United States headquarters are located within this District.

22.     IKEA's United States headquarters are responsible for the representations made by IKEA concerning the defective and dangerous chests and dressers, the merchantability of these products, and the voluntary recall of the products in the 2016-2017 timeframe.

---

[1] Alternatively, IKEA Services is responsible for the above conduct in conjunction with IKEA Retail and/or IKEA Retail is solely responsible for the above conduct.

23.     Among the items of furniture available for purchase at IKEA retail stores was a popular series of chests and dressers sold under the model name "MALM," which were available in various drawer configurations and sizes.

24.     A non-exhaustive list of all of the model chests and dressers included in the recall is set forth in the list attached hereto as Exhibit "A."

25.     At all times relevant hereto, IKEA knew that the defective chests and dressers would be used in homes, apartments, and other residential environments throughout the U.S., and that in many homes the subject chests and dressers would be accessible to small children or placed in rooms where small children would be sleeping and playing.

26.     IKEA specifically recognized that the drawers of the defective chests and dressers were attractive to children to climb on as a playtime activity. According to Lars Petersson, the President of IKEA operations in the United States who was authorized to speak for IKEA at all times relevant hereto, IKEA was aware that "[c]hests and drawers are a very tempting playground for children [because] they are using the drawers as a ladder. If children are doing that, the risk of tip-over is very high."

27.     At all times relevant hereto, IKEA knew that defective chests and dressers would be used on a variety of surfaces and in rooms with various configurations.

28.     At all times relevant hereto, IKEA knew that its chests and dressers were top-heavy and front-heavy and contained other design elements which rendered them unstable even when used in an intended and/or expected manner.

29.     At all times relevant hereto, IKEA knew that its chests and dressers, when used as free-standing units, presented an unreasonable tip-over hazard and were dangerously unsafe for

their intended and/or expected use, particularly in environments in which the furniture was used by and/or accessible to small children.

30.     At all times relevant hereto, and since at least the year 2000, IKEA knew that its chests and dressers failed to meet minimum stability requirements for tip-over prevention contained in industry standards, including ASTM F2057.

31.     By July 22, 2015, IKEA was aware of multiple deaths and injuries resulting from tip-over incidents involving the defective chests and dressers.

32.     Nevertheless, IKEA continued to sell the defective chests and dressers.

33.     By June 28, 2016, IKEA had become aware of two additional deaths and 13 additional injuries resulting from tip-over incidents involving the MALM line of defective chests and dressers. IKEA was also aware of tip-over incidents involving chests and dressers sold by IKEA other than the MALM series, which resulted in the deaths of three children and injuries to nineteen more.

34.     On June 28, 2016, IKEA initiated a voluntary recall of the defective chests and dressers that included the MALM line and additional children's and adult chests and dressers marketed under various model names. *See* Exhibit A.[2]

35.     In the June 2016 recall announcement, IKEA stated that "About 8 million MALM chests and dressers and 21 million additional children's and adult chests and dressers [had been sold to consumers] in the U.S."[3]

---

[2]     IKEA NORTH AMERICAN SERVICES LLC, *IKEA Chests of Drawers/Dressers*, available at https://www.ikea.com/ms/en_US/pdf/non_malm_CoD_list_rev.pdf (last viewed May 6, 2020).

[3]     CONSUMER PRODUCT SAFETY COMMISSION, *Following an Additional Child Fatality, IKEA Recalls 29 Million MALM and Other Models of Chests and Dressers Due to Serious Tip-Over Hazard; Consumers Urged to Anchor Chests and Dressers or Return for Refund*, available at https://cpsc.gov/Recalls/2016/following-an-additional-child-fatality-ikea-recalls-29-million-malm-and-other-models-of (last viewed May 6, 2020).

36.     In the June 2016 recall announcement, IKEA stated that, "Consumers are entitled to a <u>full refund</u> for chests and dressers manufactured between January 2002 and June 2016. Consumers with chests and dressers manufactured prior to January 2002 will be eligible for a partial store credit."[4]

37.     June 28, 2016, was the very first opportunity that Plaintiffs or any U.S. owners and purchasers of the chests and dressers had to learn that the MALM and other chests and dressers which they had purchased or owned, and which were now subject to the recall, had serious defects, were not merchantable as they had been represented to be, but were in fact dangerous and not fit for ordinary use.

38.     Despite the promises made in connection with its voluntary recall, IKEA employees were not prepared to properly process returns of the defective and dangerous chests and dressers, did not issue "full refund[s]," but rather, if a return was accepted, gift cards were often provided for IKEA merchandise, even if the defective chests and dressers had been manufactured after January 2002.

39.     By November 21, 2017, IKEA had learned of an additional child death resulting from a MALM tip-over incident and an additional 91 injuries.

40.     IKEA had also learned of an additional 53 injuries to children involving chests and dressers from lines other than the MALM line.

41.     On November 21, 2017, IKEA re-announced the recall of the MALM and other defective chests and dressers.

---

[4]      *Id*. (emphasis added).

42.     In the November 21, 2017 re-announcement, IKEA stated that approximately 17.3 million chests and dressers were subject to the recall.

43.     In the November 21, 2017 re-announcement, IKEA stated that consumers could obtain a refund, to wit:

> Consumers should immediately stop using any recalled chest or dresser that is not properly anchored to the wall and place it in an area that children cannot access. Contact IKEA for a choice between two options: <u>refund</u> or a free wall-anchoring kit. IKEA will pick up the recalled dressers free of charge or provide a one-time, free in-home wall-anchoring service for consumers upon request.[5]

(emphasis added).

44.     IKEA's November 2017 re-announcement repeated the same disingenuous statement concerning the availability of refunds from the 2016 recall, while continuing to issue gift cards to consumers who attempted to return defective chests and dressers instead of providing cash refunds.

45.     Gift cards for use at IKEA did not and do not adequately compensate consumers who paid cash for the defective and dangerous chests and dressers, incurred costs in returning defective and dangerous chests and dressers to an IKEA retail location, or paid to have the furniture delivered at the time of purchase.

46.     Moreover, gift cards are not an adequate remedy for consumers who no longer wish to have IKEA furniture in their home, but would prefer another brand, or who have no need or desire for any IKEA product at all.

---

[5]     CONSUMER PRODUCT SAFETY COMMISSION, *IKEA Reannounces Recall of MALM and Other Models of Chests and Dressers Due to Serious Tip-over Hazard; 8th Child Fatality Reported; Consumers Urged to Choose Between Refund or Repair*, available at https://www.cpsc.gov/Recalls/2018/IKEA-Reannounces-Recall-of-MALM-and-Other-Models-of-Chests-and-Dressers-Due-to-Serious-Tip-over-Hazard (last viewed May 6, 2020).

47.     Additionally, IKEA's alternative "remedy" of providing wall anchoring kits was and is an insufficient and non-viable remedy because many consumers do not know how to install them, do not trust that the kit will fix the problem, and because wall anchoring is often ineffective in preventing tip-overs of chests and dressers which are unstable by design.

48.     At all times after the announcement of the 2016 recall, IKEA failed to prosecute its campaign to recall the defective chests and dressers in a reasonably effective and earnest manner.[6]

49.     Specifically, IKEA failed to develop communications concerning the recall that were effective in reaching purchasers of the defective and dangerous chests and dressers; instead, IKEA carried out an ineffectual and inadequate recall campaign that 1) most purchasers of the chests and dressers never became aware of, 2) failed to motivate purchasers to respond to the recall's promise to provide a refund for recalled items returned to IKEA and 3) did not always provide the cash refund IKEA had promised in its announcement and re-announcement of the recall..

50.     Additionally, IKEA failed to take necessary action to contact owners of its defective products as quickly as possible in order to hasten their removal from homes of American consumers, leaving millions of defective and dangerous chests and dressers accessible to consumers and their children.

51.     IKEA failed to communicate accurate and understandable information in a timely and effective manner to the public about the defective chests and dressers, the hazards they presented to children, and the availability of refunds and wall-anchoring services.

---

[6]     *See* Consumer Product Safety Commission, how to prosecute a recall.

52.     IKEA failed to properly coordinate and balance its recall notice efforts. As a result, media coverage of the recall was sparse after the formal announcement of the recall, leaving most consumers unaware that a recall had been announced.

53.     Indeed, in the three months following the announcement of the 2016 recall, IKEA had only issued a miniscule number of refunds to consumers of the defective chests and dressers in comparison to the 29,000,000 defective chests and dressers subject to the recall.

54.     As a result of IKEA's failure to implement an effective recall, many or most purchasers of the defective chests and dressers did not receive any notice of the recall or the re-announced recall.

55.     As a result of IKEA's failure to implement an effective recall, the defective and dangerous chests and dressers have remained in millions of consumers' homes and have increased the likelihood of further harm to children from tip-overs of IKEA's admittedly unsafe and unstable furniture.

56.     At all relevant times, IKEA's conduct as described herein was directed by its management from its U.S. headquarters in Pennsylvania, within this District.

57.     At all relevant times, IKEA's conduct was a result of deliberate policies and practices, was willful, and was carried out in reckless disregard of the health and safety of consumers and their children.

### The Experience of the Representative Plaintiffs

58.     Plaintiffs purchased two 4-drawer MALM dressers from an IKEA retail store in 2012.

59.     Plaintiffs' 4-drawer MALM dressers are subject to the 2016 recall and the "re-announced" 2017 recall.

60.     In August 2018, after becoming aware of the recall, Plaintiffs visited an IKEA store near their home and attempted to return the dressers.

61.     Plaintiffs went to the designated returns section of the IKEA store and requested that IKEA accept the return of the two 4-drawer MALM dressers and issue cash refunds pursuant to the announced terms of the recall program.

62.     IKEA refused to accept Plaintiffs' dressers under the terms of the voluntary recall.

63.     IKEA refused to give Plaintiffs a full cash refund for the dressers, as they requested.

64.     Plaintiffs had to take the defective and dangerous dressers back to their home, and have for some time kept them in their garage.

### The Experiences of Other IKEA Shoppers

65.     Plaintiffs' experience at their local IKEA store is not unique.  Among the limited number of owners and purchasers of the defective chests and dressers in the U.S. who were even aware of the recall, many have taken to the internet to complain that IKEA did not honor the terms of the recall, did not process their attempts to return the defective chests and dressers, and did not provide full cash refunds.

66.     For example, users in the [Reddit IKEA chest dresser recall megathread](#) have complained about the slowness of IKEA to issue refunds, if at all:

> ⬆ widge14  1 point · 2 years ago
> ⬇ Is anyone having trouble getting their refund? I have been waiting for a month- I called their customer service line (which says open until midnight) at 10 PM and they asked me to call back tomorrow. I'm pretty sketched out. They also do not provide any documentation when they pick up the dresser
>
> Share  Report  Save
>
>> ⬆ apaperloveaffair  1 point · 2 years ago · edited 2 years ago
>> ⬇ Same here! I was told my check was sent out on August 30th. Was told it would take 5 business days to arrive to me. And here I am 3 weeks later and over a month since they came to pick up my dresser.
>>
>> I asked where it was being mailed from and they stated it was coming in from Maryland. So...snail mail timeline sounds right? I am going into my post office today to see if anything has arrived.
>>
>> Update Edit: Nothing at the post office from IKEA.
>>
>> Share  Report  Save
>>
>>> ⬆ widge14  1 point · 2 years ago
>>> ⬇ Update: called again today, got transferred to 3 different people. The refund was being held up, but they weren't sure why so they are sending a check today.
>>>
>>> Share  Report  Save
>>>
>>>> ⬆ widge14  1 point · 2 years ago
>>>> ⬇ UPDATE: I got a letter from Ikea saying my refund was being processed and could take up to 8 weeks (no check) I hope this includes the 6 weeks I've been waiting :(
>>>>
>>>> Share  Report  Save
>>>>
>>>>> ⬆ apaperloveaffair  2 points · 2 years ago
>>>>> ⬇ Oh wow....well that would have been nice to know. Looks like some people got their refund sooner. :/
>>>>>
>>>>> Share  Report  Save

67.     On Facebook, in response to a post about the 2017 re-announced recall, one user complained that IKEA, contrary to its representations, refused to come pick up the defective chests and dressers they had purchased:



> **Danielle 'Kiene' Weis** We had this dresser, it was anchored into the wall properly, and it still fell on our kids! Also, IKEA's customer service sucks, and despite claiming they would come get it from us, we never heard a word back from them! Ended up driving 3 hours to the closest store to get rid of the deathtrap!!
>
> Like · Reply · 1y

12

68.   Another user complained about not receiving the refund to which he was entitled by the recall:



69.     Still another user complained that IKEA would not honor returns of multiple

defective chests and dressers:



70.     On Twitter, one user complained about not receiving her refund after her defective chests and dressers were picked up:



71.     Another Twitter user complained of waiting for nearly two months for her refund:



72.     On Yelp, a review website, one user complained that IKEA would not accept a

broken MALM dresser that had fallen on her child:




**Kasey S.**
Irvine, United States
0 friends
85 reviews

★☆☆☆☆ 14/8/2016

Tried to return some drawers from the defective and **recalled** MALM dresser. The manager, Darlin Pac Delmy, said we couldnt get the refund because we didnt bring the entire dresser w all the frame parts back. As we had already explained, the dresser literally caved in, fell over on our child, and fell apart. We brought back as much of it as we could, but the rest of the frame was in splinters and had to be thrown away with gloves on so the nails and splinters didnt injure us.

73.     Another Yelp user complained about IKEA's unresponsiveness concerning pickup

of defective chest and dressers:




**Shong C.**
Lake Forest, United States
0 friends
3 reviews

★☆☆☆☆ 17/11/2016

Worst service ever! You better hope you would never need to deal with any service.

As part of the MALM dresser **recall** (which could cause death to children), Ikea could never figure it out with the pickup company.
1st attempt: pickup company never gave a date, and just call randomly on a day and told me they are 10 minutes away. Of course that is a no go. No one is home. No planning, no notice what so ever.
While I have them on the phone, i schedule a date to 2nd attempt on Tuesday. The gal told me they will call to follow up to give me a pickup window. Come Tuesday, no follow up call, no body show up, ever

Call Ikea to figure this out, spent 1 hour on the phone, talked to a supervisor, 1st he try to blame me for not being home, finally he informed me that there is no pickup window, the window is the whole day. I asked for assurance that the pickup company would actually show up, got no answer. So we are scheduled for another week.

Maybe, at some point I would be able to get these 3 pieces of dangerous furniture out of the house. Terrible

No longer going to buy from them. I'll have my refund in check please thank you, and spend it in another furniture store.

2 people voted for this review



74.     Upon information and belief, IKEA was aware of thousands of complaints on Internet sites about IKEA's failure to effectively administer its recall campaign and its failure to comply with the terms of its recall program.

## V.     CLASS ACTION ALLEGATIONS

75.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a nationwide class (the "Class") defined as follows:

> All natural persons residing in the United States and its Territories who purchased or owned a chest or dresser included in IKEA's June 28, 2016 recall, and the re-announced recall of November 21, 2017.

76.     Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff

77.     No class member could reasonably have discovered the unmerchantable nature of the defective chests and dressers prior to the June 28, 2016 recall announcement.

78.     ***Numerosity—Federal Rule of Civil Procedure 23(a)(1).***   The members of the Class are so numerous that joinder of all members is impracticable. The precise number of Class members is known only to Defendants, but Plaintiffs aver upon information and belief that the members of the Class number in the thousands or millions.

79.     ***Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).***   There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members, including:

> A.     Whether the chests and dressers were merchantable;

> B.     Whether IKEA represented that chests and dressers were of a particular standard, quality or grade.

C.      Whether IKEA carried out its recall campaign and its "re-announced" recall in an effective manner designed to maximize notice of the recall to purchasers and owners of the defective chests and dressers.

D.      Whether IKEA provided cash refunds to all consumers who attempted to return defective chests and dressers subject to the recall, as IKEA had promised it would;

E.      Whether IKEA made misleading statements in connection with its representations with respect to the availability of cash refunds from its retail stores;

F.      Whether IKEA breached any implied warranty of merchantability with respect to the defective chests and dressers;

G.      Whether Plaintiffs and the members of the Class have been injured by IKEA's misconduct;

H.      Whether Plaintiffs and the members of the Class are entitled to relief, and the amount and nature of such relief;

I.      Whether IKEA fulfilled its voluntarily assumed duty to carry out a timely and effective recall of the defective chests and dressers.

80.      *Typicality—Federal Rule of Civil Procedure 23(a)(3).*  Plaintiffs' claims are typical of the claims of the members of the Class, which all arise from the same operative facts and are based on the same legal theories.

81.      *Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).* Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are committed to vigorously litigating this matter and have retained counsel experienced in handling consumer class actions. Neither Plaintiffs nor her counsel have any interests which might cause them not to vigorously pursue this claim.

18

82. This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing the Class, as well as a risk of adjudications which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or which would substantially impair or impede their ability to protect their interests.

83. Whether Defendants violated the law can be determined by discovery of IKEA's policies and conduct pertaining to prosecution of the recall and by inspection of IKEA's business records.

84. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

85. ***Insufficiency of Separate Actions—Federal Rule of Civil Procedure 23(b)(2).*** Defendants have acted in a manner that applies generally to the Class, so that relief is appropriate respecting the Class as a whole. The Class thus satisfies the requirements of Fed. R. Civ. P. 23(b)(2).

86. ***Superiority—Federal Rule of Civil Procedure 23(b)(3).*** A class action is a superior method for the fair and efficient adjudication of this controversy. The interest of individual members of the Class in individually controlling the prosecution of separate claims against IKEA is slight because the amount of damages each may recover is limited. Management of the Class's claims is likely to present significantly fewer difficulties than those presented by having many individual claims. Members of the Class may self-identify.

# VI.   CLAIMS *for* RELIEF

### COUNT I -   Pennsylvania Unfair Trade Practices and Consumer Protection Law

*On Behalf of Plaintiffs and the Class*

87.     Plaintiffs reallege and incorporate by reference the above paragraphs as though fully set forth herein.

88.     In a national class action matter, the Pennsylvania Supreme Court recently held that "a non-Pennsylvania resident may bring suit under the [Pennsylvania Unfair Trade Practices and Consumer Protection Law] against a Commonwealth-headquartered business based on transactions that occurred out-of-state." *Danganan v. Guardian Protection Services*, 645 Pa. 181, 195-96, 179 A.3d 9, 17 (2018).

89.     Plaintiffs purchased the defective chests and dressers primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

90.     All of the acts complained of herein were perpetrated by IKEA in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

91.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have . . . characteristics, . . . benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 P.S. § 201-2(4).

92.     IKEA engaged in unlawful trade practices, including representing that defective chests and dressers have characteristics, uses, benefits, and qualities which they do not have;

representing that defective chests and dressers are of a particular standard and quality when they are not; advertising defective chests and dressers with the intent not to sell them as advertised; promising cash refunds to persons who returned recalled chests and dressers but failing in many instances to issue the refunds; deliberately carrying out a feeble and ineffective recall campaign that IKEA knew would not reach most American consumers; and engaging in other fraudulent or deceptive conduct which created a likelihood of confusion or of misunderstanding.

93.     In the course of its business, IKEA concealed the defects in the defective chests and dressers and otherwise engaged in activities with a tendency or capacity to deceive. IKEA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the defective chests and dressers. The defects in the defective chests and dressers include not only the specific design defect (*e.g.*, the tendency to tip over and cause injury), but also include the defective process through which IKEA built the defective chests and dressers, a process that included cost-cutting, minimizing the importance of safety issues, the depletion of resources devoted to recognizing and studying safety issues, and the failure to adhere to a recognized safety standard, namely ASTM F2057.  All of these defective processes would be material to a reasonable consumer.

94.     Long before it initiated the June 28, 2016 recall, IKEA, but not the public or the Class herein, knew of serious defects impairing the safe use of the defective chests and dressers sold to Plaintiffs and Class members, because of lawsuits, investigations, and notifications from regulatory authorities.  IKEA acquired additional information concerning the serious defects and safety issues impacting the defective chests and dressers, but concealed that information.

21

95.     By failing to disclose and by actively concealing the defects in the defective chests and dressers, which it marketed as safe, reliable, and of merchantable quality, IKEA engaged in unfair and deceptive business practices in violation of the UTPCPL.

96.     In the course of IKEA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in the defective chests and dressers.

97.     IKEA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Class members, about the true safety and reliability of the defective chests and dressers.

98.     IKEA knew or should have known that its conduct violated the UTPCPL.

99.     IKEA's unfair and deceptive trade practices harmed Plaintiffs and Class members because the defective chests and dressers were worthless as the result of IKEA's concealment of, and failure to remedy, the defects.

100.    Indeed, IKEA purported to offer a full refund during the recall process in acknowledgement of the fact that the chests and dressers were of no economic value whatsoever to purchasers and owners, because of the inability to use the chests and dressers arising from their inherently unstable design.

101.    IKEA's concealment of the defects in the defective chests and dressers was material to Plaintiffs.  If they had been aware of same, Plaintiffs would not have purchased the defective chests and dressers.

102.    Plaintiffs suffered ascertainable loss caused by IKEA's misrepresentations and its concealment of and failure to disclose the defects in the defective chests and dressers.

103.     As a direct and proximate result of IKEA's violations of the UTPCPL, Plaintiffs and Class members have suffered damages in an amount, at a minimum, of the purchase price of the defective chests and dressers.

104.     IKEA is liable to Plaintiffs and members of the Class for the relief sought herein, in an amount to be proven at trial.

### COUNT II - Breach of the Implied Warranty of Merchantability

*On Behalf of Plaintiffs and the Class*

105.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

106.     At all times relevant to Plaintiffs' claims, IKEA was a merchant with respect to the defective chests and dressers.

107.     A warranty that the defective chests and dressers were in merchantable condition was implied by law in the transactions pursuant to which Plaintiffs and members of the Class purchased the defective chests and dressers from IKEA.

108.     According to the Supreme Court of Pennsylvania, merchantability "require[s] that [goods] have an inherent soundness which makes them suitable for the purpose for which they are designed, that they be free from significant defects, that they perform in the way that goods of that kind should perform, and that they be of reasonable quality within expected variations and for the ordinary purpose for which they are used."  *Gall by Gall v. Allegheny County Health Dept.*, 521 Pa. 68, 70, 555 A.2d 786 (1989) (citations omitted).

109.     The defective chests and dressers were not in merchantable condition because they were, without limitation, not fit for the ordinary purposes for which such goods are used.

110.     The defective chests and dressers are inherently defective in that there is a substantial risk of tip-over when used in an intended and/or expected manner, thereby causing an increased likelihood of serious injury or death.

111.     As alleged above, IKEA had notice of the non-merchantable status of the defective chests and dressers at least as early as the June 2016 recall, before Plaintiffs attempted to return their MALM dressers to IKEA in 2018 for a refund soon after learning of the recall, but plaintiffs were refused a refund by IKEA.

112.     As a direct and proximate result of IKEA's breach of the implied warranty of merchantability, which no Class member could have known of prior to the 2016 recall, Plaintiffs and the Class have suffered the above-alleged damages.

113.     IKEA is liable to Plaintiffs and members of the Class for the relief sought herein, in an amount to be proven at trial.

### COUNT III - Negligence

*On Behalf of Plaintiffs and the Class*

114.     Plaintiffs reallege and incorporates by reference all paragraphs as though fully set forth herein.

115.     The Supreme Court of Pennsylvania has held that the law of negligence establishes a duty of care applicable to manufacturers that encompasses a "*continuum* from the requirements of: a warning of dangers, through a stronger warning if justified by the known risks, through non-marketing or discontinuance of marketing when it becomes or should become known that the

product simply should not be used in light of its relative risks." *Lance v. Wyeth*, 624 Pa. 231, 273, 85 A.3d 434, 459-60 (2014) (emphasis added).

116.    In this continuum, IKEA undertook a duty not only to cease further distribution of the defective and dangerous chests and dressers, but also to warn buyers post-sale, to recall, and to assist in the removal from the market and the homes of Class members the defective and dangerous chests and dressers.

117.    As alleged above, IKEA breached and continues to breach those duties with respect to Plaintiffs and members of the Class.

118.    As a direct and proximate result of IKEA's negligence, Plaintiffs suffered the above-alleged damages.

119.    Therefore, Defendants are liable to Plaintiffs and the members of the Class for the relief sought herein.

## VII.    PRAYER *for* RELIEF

WHEREFORE, Plaintiffs DIANA DUKICH and JOHN DUKICH respectfully request that this Honorable Court enter an Order granting the following relief:

A.    Pursuant to FED. R. CIV. P. 23, certifying the Class proposed herein, appointing Plaintiffs as representatives of same, and appointing undersigned counsel as counsel for the Class;

B.    Awarding Plaintiffs and members of the Class actual damages;

C.    Pursuant to 13 Pa. C.S. § 2714, awarding Plaintiffs and members of the Class damages for nonconformity as may be proven at trial;

D.    Pursuant to 13 Pa. C.S. § 2715, awarding Plaintiffs and members of the Class such incidental and consequential damages as may be proven at trial;

E.      Pursuant to 73 P.S. § 201-9.2(a), awarding Plaintiffs and the members of the Class treble damages or $100, whichever is greater;

F.      Pursuant to 73 P.S. § 201-9.2(a), awarding Plaintiffs their attorneys' fees and costs;

G.      Awarding Plaintiffs and all Class members a full cash refund;

H.      Awarding Plaintiffs and all Class members damages for returning or properly disposing the defective and dangerous chest and dressers;

I.      Ordering IKEA to notify all Class members directly by email or U.S. mail of the defective nature of the chests and dressers;

J.      Awarding such further relief as this Court deems just and proper.

## VIII.   <u>JURY TRIAL DEMAND</u>

120.    Plaintiffs demand trial by jury on all issues so triable.

Dated: May 6, 2020

Respectfully submitted,

DIANA DUKICH and JOHN DUKICH, *on behalf of themselves and all others similarly situated.*

By:    */s/ Alan M. Feldman*
Alan M. Feldman
Daniel J. Mann
Edward S. Goldis
FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
T: (215) 567-8300
F: (215) 567-8333
afeldman@feldmanshepherd.com
dmann@feldmanshepherd.com
egoldis@feldmanshepherd.com

James A. Francis
John Soumilas
FRANCIS MAILMAN SOUMILAS, P.C.
1600 Market Street, Suite 2510
Philadelphia, PA 19103
T: (215) 735-8600
F: (215) 940-8000
jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com

*Attorneys for Plaintiffs*