IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIANA and JOHN DUKICH | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| IKEA US RETAIL LLC, et al. | : | NO. 20-2182 |

MEMORANDUM

Bartle, J.                                          April 19, 2021

Plaintiffs Diana and John Dukich have sued defendants IKEA US Retail LLC and IKEA North America Services LLC ("IKEA") in this putative class action brought under the Class Action Fairness Act, 28 U.S.C. § 1332(d), for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. §§ 201-1 et seq., and for negligence.  The Dukiches bring suit regarding two recalls that IKEA issued for dressers the Dukiches had purchased.  They seek the money IKEA promised but never refunded under the terms of the recalls as well as actual, consequential, and treble damages and notification to all class members of the defective nature of the chests and dressers.  On January 14, 2021, the court denied IKEA's motion to dismiss.  Class action discovery has not yet begun.

Before the court is the motion of ten prospective plaintiffs[1] to intervene in this action pursuant to Rule 24 of the Federal Rules of Civil Procedure.

I

For present purposes, the court accepts as true the following allegations set forth in the amended complaint and in the proposed second amended complaint included with the motion to intervene pursuant to Rule 24.  IKEA is a major retail chain which designs and sells furniture.  The Dukiches are husband and wife who reside in Minnesota and have two young children.  The Dukiches purchased two four-drawer dressers of the MALM model from IKEA for approximately $100 each in or around 2012.

As noted, ten individuals seek to intervene as plaintiffs:

> (1)   Audra Andrews, a resident of Washington, purchased a six-drawer dresser of the MALM model from IKEA for approximately $179 between 2008 and 2010.

---

1.   The ten prospective plaintiffs are: Audra Andrews, Janet Bou, Ana Medina, Samantha Meyers, Christine Ross, Chelsey Sinclair, Christopher Slater, Keri Strauch, Jason Thompson, and Erin Wallace.  We will collectively refer to them as "the prospective plaintiffs."

(2)   Janet Bou, a resident of New Jersey, purchased two MALM dressers from IKEA in or around 2006 for approximately $200 in total.

(3)   Ana Medina, a resident of New Jersey, purchased a three-drawer MALM dresser from IKEA after 2002 for approximately $80.

(4)   Christine Ross, a resident of Illinois, purchased two three-drawer MALM dressers from IKEA between 2013 and 2014 for approximately $160 in total.

(5)   Samantha Meyers, a resident of North Carolina, purchased two MALM dressers in 2015 from IKEA for approximately $160 in total.

(6)   Chelsey Sinclair, a resident of Pennsylvania, purchased a six-drawer MALM dresser from IKEA in 2014 for approximately $169.

(7)   Christopher Slater, a resident of California, purchased a three-drawer MALM dresser from IKEA in 2014 for approximately $100.

(8)   Keri Strauch, a resident of Massachusetts, purchased a four-drawer MALM dresser from IKEA in 2010 for approximately $129.

(9)   Jason Thompson, a resident of Michigan, purchased two three-drawer dressers of the HEMNES model and

one six-drawer HEMNES dresser from IKEA in 2012 for approximately $450 in total.

(10) Erin Wallace, a resident of Michigan, purchased a six-drawer MALM dresser from IKEA in 2013 for approximately $169.

By June 28, 2016, IKEA knew of two deaths and thirteen injuries from tip-over accidents involving the MALM line of dressers as well as deaths and injuries from other chest and dresser models.  That day IKEA, together with the U.S. Consumer Product Safety Commission ("CPSC"), announced a voluntary recall ("2016 recall") for 29 million chests and dressers in the United States including the MALM and HEMNES series which the Dukiches and all of the prospective plaintiffs had purchased.

The 2016 recall announcement stated that "[t]he recalled chests and dressers are unstable if they are not properly anchored to the wall, posing a serious tip-over and entrapment hazard that can result in death or injuries to children."  IKEA offered either a repair or refund.  The repair program included a free wall-anchoring repair kit which purchasers can either install themselves or have IKEA install one time for free upon request.  In the alternative, IKEA offered a full refund for chests and dressers manufactured between 2002 and 2016.  Purchasers of products that were

manufactured prior to January 2002 were eligible for partial store credit.

By November 21, 2017, IKEA had become aware of another death of a child from the tip-over of a MALM dresser and ninety-one more injuries as well as deaths and injuries from other models of dressers.  IKEA announced a second recall on November 21, 2017 ("2017 recall") which subjected 17.3 million dressers to recall and instructed consumers to "immediately stop using any recalled chest or dresser that is not properly anchored to the wall and place it in an area that children cannot access." Both the MALM and HEMNES models were included in the 2017 recall in which IKEA again offered the same two options for either refund or a free wall-anchoring kit and specified that it will "pick up the recalled dressers free of charge or provide a one-time, free in-home wall-anchoring service" upon request.

In August 2018, the Dukiches visited the return section of an IKEA retail store near their home in Minnesota to return their dressers, which were subject to both the 2016 and 2017 recalls, for a cash refund in the amount of the purchase price of approximately $200.  The Dukiches allege that IKEA refused to accept the dressers, give them $200 in cash as a refund, or provide any alternative refund.  Since that time, the Dukiches have stored the dressers in their garage.

All of the prospective plaintiffs allege that they were not notified about the 2016 or 2017 recalls and only learned about these recalls as a result of this lawsuit.  Thus, they have not yet sought a repair kit or refund because they were not aware that either option existed.

II

The basis of the claims of the Dukiches is IKEA's failure to issue them a refund and to comply with the terms of the 2016 and 2017 recalls.  The prospective plaintiffs move to intervene so as to represent potential class members who were not aware that dressers they had purchased from IKEA were subject to the 2016 and 2017 recalls.  They allege that they have suffered loss of a full refund as a result of the lack of notification of the recalls.  They seek that refund through the filing of this suit, along with actual, consequential, and treble damages.  Like the Dukiches, the prospective plaintiffs do not seek damages for personal injuries or diminution in value of the dressers.

IKEA first challenges the standing of the prospective plaintiffs on the ground they have alleged no concrete injury. IKEA argues that the prospective plaintiffs, unlike the Dukiches, have not attempted to return their recalled products and have thus not been refused a refund or repair kit.

According to IKEA, they can still seek a refund since the recalls remain ongoing.

The prospective plaintiffs counter that their injuries are in fact concrete and particularized since, like the Dukiches, they did not receive a cash refund from IKEA as promised under the terms of the recall.  However, unlike the Dukiches, the prospective plaintiffs also allege that their failure to receive a refund was because IKEA did not notify them pursuant to the 2016 and 2017 recalls.  Thus, the prospective plaintiffs could not attempt to return the recalled products since they were not aware of the recalls in the first place.

Article III of the Constitution requires that there be a case or controversy in order to proceed with a lawsuit.  This requirement of standing is a "threshold issue" that must be decided by a district court before reaching the merits of the matter.  Wayne Land & Mineral Grp., LLC v. Del. River Basin Comm'n, 959 F.3d 569, 574 (3d Cir. 2020).  The plaintiff has the burden of showing that he or she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017).

An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized

-7-

. . . and (b) 'actual or imminent, not conjectural or
hypothetical.'"   Lujan v. Defs. of Wildlife, 504 U.S. 555, 560
(1992).  Our Court of Appeals has explained that "economic
injury is one of [injury-in-fact's] paradigmatic forms" and that
"[t]he injury-in-fact requirement exists to assure that
litigants have a 'personal stake' in the litigation." Danvers
Motor Co. v. Ford Motor Co., 432 F.3d 286, 291 (3d Cir. 2005).
This burden to show injury-in-fact is "not Mount Everest."  Id.
at 294.

        In support of its argument that the prospective
plaintiffs lack standing, IKEA cites Finkelman v. National
Football League which involved one plaintiff who opted not to
purchase any tickets to the Super Bowl because of the high
prices for tickets and another plaintiff who purchased tickets
on a secondary market for much higher than face value.  810 F.3d
187, 189-90 (3d Cir. 2016).  Both plaintiffs sued the National
Football League ("NFL"), among other entities, for violation of
a New Jersey law concerning the resale of tickets.

        The Court of Appeals upheld the district court's
finding that the first plaintiff "lacks Article III standing
because he never purchased a ticket to the Super Bowl, meaning
that he suffered no out-of-pocket loss."  Id. at 195.  It
explained that since he "never purchased a ticket on the
secondary market, he suffered no more injury than any of the

possibly tens of thousands of people who thought about
purchasing a ticket to the Super Bowl and chose not to" and that
"the amount of any damages [plaintiff] might have suffered due
to the NFL's alleged misconduct is completely indeterminate."
Id.  This was not a case of "lost opportunity" because he "took
no meaningful action to pursue the 'opportunity' to attend the
game at all."  Id.  The Court of Appeals similarly found that
the second plaintiff lacked standing because he chose not to
enter the NFL's ticket lottery and instead purchased tickets on
the secondary market at a much higher rate, so any harm he
suffered was due to "his own decision not to enter the ticket
lottery."  Id. at 198.

        IKEA argues that the prospective plaintiffs in this
matter are similar to the plaintiffs in Finkelman who took "no
meaningful action" to purchase a Super Bowl ticket because they
have never sought a refund and thus have never been denied one.
The court is not persuaded.  Unlike the plaintiffs in Finkelman,
the prospective plaintiffs did not know about the recalls on
their purchased dressers and the opportunity for a refund or
repair kit until the filing of this action.  Therefore they did
not have the opportunity before this lawsuit to seek a refund
because they were not notified of the 2016 and 2017 recalls.
The plaintiffs in Finkelman clearly knew the Super Bowl was
happening, and rather than attempt to obtain a ticket at face

value, one plaintiff declined to try to purchase a ticket while
the other plaintiff chose not to enter the NFL's lottery for
tickets at face value. That is not what happened with the
prospective plaintiffs in this action.

In addition, the Court of Appeals opined in Finkelman
that without an attempt to purchase a ticket the damages
plaintiff may have suffered as a result of the NFL's alleged
misconduct "is completely indeterminate." Id. at 195.  That is
not the case here.  The prospective plaintiffs know what they
paid for their dressers and now know that they are entitled to a
full refund for them under the terms of the recalls.  Thus,
their damages are not speculative but are precisely defined.

We are also not persuaded by IKEA's claim that the
prospective plaintiffs can simply attempt to return their
dressers now and receive a refund.  The prospective plaintiffs
allege that their injury stems from a lack of remedy for the
recalled products because IKEA did not timely notify them of
either recall.  Thus, they were not afforded the opportunity to
act pursuant to the terms of those recalls and seek a full
refund or repair kit.  If the prospective plaintiffs had
received notice of the recalls in 2016 or 2017 when the recalls
were announced, any refund they obtained at that time would have
been worth more than a refund issued today due to the "time
value of money," that is a dollar received in 2016 or 2017 is

-10-

worth more than a dollar received thereafter.  In re Szostek,
886 F.2d 1405, 1406 n.1 (3d Cir. 1989).

        The prospective plaintiffs have alleged a concrete and
particularized injury-in-fact from not being able to obtain a
refund for the purchase price of their dressers at the time of
the recalls in 2016 and 2017.  The amount of damages is not
speculative since they have pleaded the approximate amount that
they paid for the dressers.  In addition, the inability to
obtain a refund was caused by the alleged failure of IKEA to
notify the prospective plaintiffs about the recalls.  The
prospective plaintiffs have adequately pleaded causation.
Finally, this is an injury which is redressable by a decision of
this court.  As such, the prospective plaintiffs have standing.

                                III

        We now turn to the requirements to intervene under
Rule 24 of the Federal Rules of Civil Procedure.  Rule 24
permits "as of right intervention" or "permissive intervention."
A motion to intervene made under either provision "must state
the grounds for intervention and be accompanied by a pleading
that sets out the claim or defense for which intervention is
sought."  Fed. R. Civ. P. 24(c).

        With respect to a timely motion to intervene as of
right made under Rule 24(a):

        the court must permit anyone to intervene who:

                               -11-

> . . . .
> (2) claims an interest relating to the property
> or transaction that is the subject of the action,
> and is so situated that disposing of the action
> may as a practical matter impair or impede the
> movant's ability to protect its interest, unless
> existing parties adequately represent that
> interest.[2]

To intervene as of right, a movant must show that "(1)
the application for intervention is timely; (2) the applicant
has a sufficient interest in the litigation; (3) the interest
may be affected or impaired . . . by the disposition of the
action; and (4) the interest is not adequately represented by an
existing party in the litigation." Benjamin ex rel. Yock v.
Dep't of Pub. Welfare of Pa., 701 F.3d 938, 948 (3d Cir. 2012).
The interest in the litigation must be a "legally cognizable
interest" which "might become affected or impaired . . . by the
disposition of the action in their absence." Mountain Top
Condo. Ass'n v. Dave Stabbert Master Builder, Inc., 72 F.3d 361,
366, 368 (3d Cir. 1995).

Alternatively, for those parties seeking timely
permissive intervention pursuant to Rule 24(b), "the court may
permit anyone to intervene who . . . (B) has a claim or defense
that shares with the main action a common question of law or

---

2.    Rule 24(a)(1), not relevant here, permits intervention by
those who have an unconditional right pursuant to a federal
statute.

fact."[3]  Granting a motion for permissive intervention is a
"highly discretionary decision" of the district court.  Brody ex
rel. Sugzdinis v. Spang, 957 F.2d 1108, 1115 (3d Cir. 1992).
Rule 24(b)(3) provides that "[i]n exercising its discretion, the
court must consider whether the intervention will unduly delay
or prejudice the adjudication of the original parties' rights."

        The prospective plaintiffs make the case for both as
of right and permissive intervention.  IKEA does not focus its
arguments on the requirements of Rule 24 and instead avers that
the court should deny this motion for lack of standing as noted
above and for futility as discussed in the next section.

        We need not decide whether the prospective plaintiffs
are able to intervene in this action as of right under Rule
24(a) because they meet the requirements for permissive
intervention under Rule 24(b).  First, IKEA raises no issues
with the timeliness of this motion.  The prospective plaintiffs
move to intervene before discovery has even begun, and allowing
their intervention will not cause any undue delay.

        In addition, the prospective plaintiffs share a common
question of fact with the main action regarding the terms of the

---

3.   Rule 24(b) also provides for permissive intervention when a
conditional right to do so is granted by a federal statute or
when a government agency or officer seeks to intervene.  Neither
of those provisions are relevant here.

recalls of the MALM and HEMNES dressers, among others, and how
IKEA handled the recall and refund process.  Discovery regarding
IKEA's implementation of the recalls will relate to both the
Dukiches and the prospective plaintiffs.  There is commonality
among all these claims.

Furthermore, there is nothing to indicate that the
participation of the prospective plaintiffs in this litigation
will prejudice the rights of the existing parties. They are
represented by the same counsel that represents the Dukiches.
The prospective plaintiffs aver in their brief in support of
this motion that intervention as class representatives is meant
to address concerns previously raised by this court about the
ability of the Dukiches to represent those consumers who, unlike
the Dukiches, did not even attempt to return a recalled dresser.
Thus, all of the information before this court demonstrates that
intervention will not prejudice or delay the rights of the
Dukiches as the original parties in this action.

Finally, the prospective plaintiffs have complied with
the requirements of Rule 24(c) by stating the grounds on which
this motion was made and filing a second amended complaint
alongside the motion.  Accordingly, permissive intervention in
this action is proper.

IV

         IKEA also argues that intervention is futile because
the prospective plaintiffs fail to state a claim under the
UTPCPL or for negligence.  As to the UTPCPL claim, IKEA avers
that the prospective plaintiffs have not suffered an
ascertainable loss, do not plead an actionable statement made by
IKEA, and do not plead justifiable reliance.

         The prospective plaintiffs counter that they suffered
a loss by not being notified of the recalls of their dressers
and were not given the opportunity to return the dressers for a
refund in 2016 or 2017 when the recalls were announced.  In
addition, the prospective plaintiffs argue that the UTPCPL
covers both deceptive statements and conduct.  According to them
IKEA engaged in deceptive conduct by not notifying them of the
recalls and as a result gave them the impression that the
dressers they purchased were safe.  The prospective plaintiffs
further aver that they have pleaded justifiable reliance since
they failed to act and seek a refund on the recalled products as
a result of IKEA's deceptive conduct in not informing them of
the recalls.

         "A district court has the discretion to deny a motion
to intervene where intervention would be futile."  <u>In re Nat'l
Football League Players' Concussion Litig.</u>, 2019 WL 188431, at
*4 (E.D. Pa. Jan. 14, 2019); <u>see also</u> <u>In re Fine Paper Antitrust</u>

-15-

Litig., 695 F.2d 494, 501 (3d Cir. 1982).  The UTPCPL prohibits

"[u]nfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce."  73 Pa.

Cons. Stat. § 201-3.  The statute lays out twenty-one

definitions for "unfair methods of competition" and "unfair or

deceptive acts or practices," including a "catch-all" provision

for "[e]ngaging in any other fraudulent or deceptive conduct

which creates a likelihood of confusion or misunderstanding."

73 Pa. Cons. Stat. § 201-2(4)(xxi).

          The UTPCPL is a remedial statute, and thus courts must

construe it broadly.  Gregg v. Ameriprise Fin., Inc., 245 A.3d

637, 647 (Pa. 2021).  The Pennsylvania Supreme Court has

explained that the Legislature expanded the UTPCPL to apply to

more than just fraudulent conduct by adding the catch-all

provision which also prohibits "deceptive conduct."  Id.  A

deceptive act is "misrepresentation that has the tendency or

capacity to deceive" and does not require any particular state

of mind element.  Id. at 647-48.  Thus, the statute "imposes

liability on commercial vendors who engage in conduct that has

the potential to deceive and which creates a likelihood of

confusion or misunderstanding."  Id. at 649.

          Plaintiffs may maintain a private right of action

under the statute if they demonstrate "(1) 'ascertainable loss

of money or property, real or personal,' . . . (2) 'as a result

-16-

of' the defendant's prohibited conduct under the statute."
Kaymark v. Bank of America, N.A., 783 F.3d 168, 180 (3d Cir.
2015).  This loss must be "non-speculative."  Id.  A plaintiff
"must identify the specific act, omission or misrepresentation"
of defendant's conduct to recover under the UTPCPL.  Doherty v.
Allstate Indem. Co., 2016 WL 5390638, at *6 (E.D. Pa. Sept. 27,
2016).  The causation requirement contained within the UTPCPL
requires plaintiff to make "a showing of justifiable reliance,
not simply a causal connection between the misrepresentation and
the harm."  Hunt v. U.S. Tobacco Co., 538 F.3d 217, 222 (3d Cir.
2008).  This justifiable reliance requirement applies to all
provisions of the UTPCPL, including the catch-all clause.  Id.
at 224.  A plaintiff can establish justifiable reliance by
showing that he or she "acted, or failed to act, in response to
and as a result of the defendant's wrongful conduct."  Mellish
v. CACH, LLC, 2020 WL 1472405, at *5 (W.D. Pa. March 26, 2020).

    The prospective plaintiffs have pleaded an
ascertainable loss.  All ten of the prospective plaintiffs
allege that they were not notified of the recalls.  Because of
this lack of notification they were not able to obtain a refund
in 2016 or 2017 when the recalls were announced for their
dressers.  As stated above, the value of a refund received in
2016 or 2017 is worth more than a refund received years later.
This loss is non-speculative because the prospective plaintiffs

-17-

have pleaded the approximate amount that they paid for the
recalled products, and the amount of the refund is readily
ascertainable since IKEA offered a full refund.

The prospective plaintiffs have also adequately
pleaded deceptive conduct on the part of IKEA to sustain a claim
under the UTPCPL.  They must aver that IKEA engaged in deceptive
conduct "which creates a likelihood of confusion or of
misunderstanding."  73 Pa. Cons. Stat. § 201-2(4)(xxi).  The
prospective plaintiffs plead in the second amended complaint
that IKEA knew of the dangers to customers, particularly
children, from tip-over incidents with these specific dressers
which caused IKEA to announce the 2016 and 2017 recalls.
However, IKEA failed to notify the prospective plaintiffs about
the recalls.

This failure to notify customers of a recall
concerning their purchased products has the potential to deceive
those customers about the safety of the dressers and creates the
misrepresentation that the dressers are in fact safe to continue
using since they have not been recalled.  There is also a
likelihood of confusion or misunderstanding as a result of the
recalls because IKEA announced them in conjunction with the CPSC
but did not notify the customers that their purchases were
subject to those recalls.  This omission in IKEA's failure to

-18-

notify customers about the recalls is sufficient to constitute
deceptive conduct on the part of IKEA under the UTPCPL.

Finally, the second amended complaint pleads
justifiable reliance.  The prospective plaintiffs allege that
they did not act in returning the recalled dressers for a refund
because of IKEA's failure to notify them.  As a result of IKEA's
failure to notify, they continued using in their homes the
dressers that IKEA has admitted pose a risk of tip-over and
injury or death.  Since the prospective plaintiffs have
adequately pleaded a claim under the UTPCPL, intervention would
not be futile.

Intervention would also not be futile for negligence.
It is well established under Pennsylvania law that one who
undertakes an affirmative conduct is "under a duty to others to
exercise the care of a reasonable man."  Dittman v. UPMC, 196
A.3d 1036, 1046 (Pa. 2018).  IKEA voluntarily undertook this
recall process and issued recalls in both 2016 and 2017 related
to their products.  Therefore IKEA owes a duty to its customers
to follow through on that recall with ordinary care.  See
Restatement (Third) of Torts: Prod. Liab. § 11 (1998).  Any
negligence in failing to follow through on this voluntarily
assumed recall gives rise to a cause of action for injuries
sustained as a result of this negligence.  See Blossman Gas Co.
v. Williams, 375 S.E.2d 117, 120 (Ga. Ct. App. 1988).  The

-19-

prospective plaintiffs have pleaded facts of their injury as a
result of this alleged negligence and damages sustained from not
returning the recalled products for a refund.  Therefore the
prospective plaintiffs' intervention with respect to their claim
for negligence would not be futile.

V

Finally, IKEA argues that this court should decline to
hear this case in favor of the primary jurisdiction of the CPSC.
We have already addressed this argument in our January 14, 2021
Memorandum in this case dismissing IKEA's motion to dismiss and
see no reason to depart from that decision here.  (Doc. #30).
As previously discussed therein, primary jurisdiction "applies
where a claim is originally cognizable in the courts, and comes
into play whenever enforcement of the claim requires the
resolution of issues which, under a regulatory scheme, have been
placed within the special competence of an administrative body."
Baykeeper v. NL Indus., Inc., 660 F.3d 686, 691 (3d Cir. 2011)
(quoting United States v. W. Pac. R.R. Co., 352 U.S. 59, 64
(1956)).  Courts have looked to the following four factors to
determine if primary jurisdiction is appropriate:

> (1) Whether the question at issue is within
> the conventional experience of judges or
> whether it involves technical or policy
> considerations within the agency's
> particular field of expertise; (2) Whether
> the question at issue is particularly within
> the agency's discretion; (3) Whether there

-20-

> exists a substantial danger of inconsistent
> rulings; and (4) Whether a prior application
> to the agency has been made.

Id.  However, our Court of Appeals has cautioned that federal
courts should only abstain from exercising their jurisdiction in
"exceptional cases."  Id. at 692.  "Federal courts have a
'virtually unflagging obligation . . . to exercise the
jurisdiction given them.'"  Id. at 691 (quoting Colo. River Water
Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)).

Nothing about the prospective plaintiffs' claims
changes our analysis and decision in this regard.  In fact, IKEA
concedes that the parties agreed that this case relates to the
2016 and 2017 recalls and the Dukiches' attempt to secure a
refund for their recalled dressers.  Nevertheless, IKEA argues
in its opposition that the claims of the prospective plaintiffs
sharply diverge from the claims brought by the Dukiches.  This
argument is unfounded.  The prospective plaintiffs, like the
Dukiches, purchased dressers subject to the 2016 and 2017
recalls.  Their claims directly relate to those recalls.  While
they were not denied a refund as the Dukiches were, they still
did not receive a refund pursuant to the recalls.  For this
reason, as well as the reasons set forth in our January 14, 2021
Memorandum denying IKEA's motion to dismiss, we see no reason to
consider this one of the "exceptional cases" that merit
abstention from exercising jurisdiction in favor of the CPSC.

-21-